1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   KAISER FOUNDATION HEALTH PLAN,     )   Case No. 08-4890 SC
    INC.,                              )
8                                      )
                Plaintiff,             )   ORDER RE: CROSS
9                                      )   MOTIONS FOR SUMMARY
         v.                            )   <u>JUDGMENT</u>
10                                     )
    KATHLEEN SEBELIUS, Secretary of    )
11  the United States Department of    )
    Health and Human Services,         )
12                                     )
                Defendant.             )
13  _____  )

14

15  I.   **INTRODUCTION**

16        This litigation arises out of a contested interest charge that

17  was charged to Plaintiff Kaiser Foundation Health Plan, Inc.

18  ("Kaiser") by the Center for Medicare and Medicaid Services

19  ("CMS").  Kaiser brought suit to challenge an administrative

20  decision by the CMS Administrator, who affirmed the charge of

21  interest.  Docket No. 1 ("Compl.").  Kathleen Sebelius, as

22  Secretary of the United States Department of Health and Human

23  Services (the "Secretary"), is Defendant in her official capacity,

24  and here defends the position of the Administrator and CMS

25  (collectively, "CMS").[1]  The parties have filed cross motions for

26  _____

27        [1] The Complaint names as defendant Michael O. Leavitt, who was
    the Secretary at the time the Complaint was filed.  <u>See</u> Compl. at
    1.  Since that time, Kathleen Sebelius was sworn in as Secretary,
28  and is now substituted as Defendant pursuant to Rule 25(d) of the

summary judgment, and both motions have been fully briefed.  Docket

Nos. 14 ("Kaiser Mot."), 17 ("CMS Mot."), 18 ("Kaiser Reply"), 19

("CMS Reply").  The Court has reviewed both parties' submissions,

and for the reasons set forth below hereby GRANTS CMS's motion and

DENIES Kaiser's motion.

## II.   BACKGROUND

### A.   Regulatory Overview

A Health Care Prepayment Plan ("HCPP") is one of several types

of organizations, along with Health Maintenance Organizations

("HMOs") and Competitive Medical Plans ("CMPs") that may

participate in the Medicare program by entering into written

agreements with CMS.  See 42 C.F.R. §§ 417.400, 417.801.  CMS pays

HCPPs in advance to provide certain services to their Medicare

enrollees under Medicare Part B.  Id. §§ 417.800, 417.808.  CMS

provides the HCPP with monthly advance payments that are "equal to

the estimated per capita cost of providing covered services to the

[HCPP's] Medicare enrollees, based upon the types and components of

costs that are reimbursable," at a rate that is "determined

annually by CMS on the basis of the [HCPP's] annual operating and

enrollment forecast."  Id. § 417.570(b); see also id. § 417.808.

In other words, these prepaid amounts are based on the HCPP's

estimated future expenditures, and as such, CMS typically overpays

or underpays the HCPP.

At the end of every fiscal year, the HCPP submits to CMS a

_____

Federal Rules of Civil Procedure.

2

cost report, which CMS uses to determine whether the HCPP was underpaid or overpaid for the period, and by how much. <u>Id.</u> § 417.810.  CMS then typically sends the HCPP a "notice of the amount of program reimbursement" ("NPR"), which indicates either the amount due CMS by the HCPP (in the event that CMS overpaid) or the amount due the HCPP by CMS (in the event that CMS underpaid). <u>Id.</u>  If CMS finds that it has overpaid the HCPP, CMS is entitled to charge interest on the amount due if it is not promptly repaid. <u>See</u> <u>id.</u> § 405.378.  This interest will begin accruing once there has been a "final determination" as to the amount due. <u>Id.</u> § 405.378(b).  Subsection 405.378(c) identifies numerous events that constitute a "final determination," thereby triggering the accrual of interest.  For example, a NPR that is coupled with a written demand for payment is a "final determination" that begins the accrual period.  <u>Id.</u> § 405.378(c)(1)(i).  Of particular relevance to this litigation is the type of "final determination" listed in § 405.378(c)(1)(iv), which provides that the following constitutes a final determination: "The due date of a timely-filed cost report that indicates an amount is due CMS, and is not accompanied by payment in full."[2]  Similarly, subsection 405.378(e)(2)(i) states: "If a cost report is filed and indicates that an amount is due CMS, interest on the amount due will accrue from the due date of the cost report . . . ."

---

[2] The due date for cost reports is set out in 42 C.F.R. § 413.24(f)(2): "Cost reports are due on or before the last day of the fifth month following the close of the period covered by the report.  For cost reports ending on a day other than the last day of the month, cost reports are due 150 days after the last day of the cost reporting period."

CMS generally audits and processes the data in submitted cost reports.  See id. § 417.810(c).  Cost reports sometimes undergo prolonged periods of auditing, which can last for years.  See Kaiser Reply at 2-3.  In the event that a cost report is incorrect, the regulations provide: "Amended cost reports to revise cost report information that has been previously submitted by a provider may be permitted or required as determined by CMS."  42 C.F.R. § 413.24(f).

**B.   Factual Background**

Kaiser is a HCPP, and at all times relevant to this litigation has been duly certified.  Kaiser Mot. at 5.  The charges that are at the heart of this litigation stem from the cost report that Kaiser filed on June 21, 1996, for its fiscal year ending December 31, 1995.  Id.  The cost report indicated that Kaiser had been underpaid for the 1995 period, and was due $13,003,585.00 from CMS.[3]  See Administrative Record ("AR") at 3, Docket No. 10.  On September 25, 1996, CMS adjusted this figure, raising it to $13,263,163.00, and made a tentative settlement with Kaiser in that amount.  Id.

The cost report and associated data for the 1995 period underwent several years of auditing.  AR at 120, 173, 223.  On June 30, 1999, CMS's contractor concluded that CMS had actually overpaid Kaiser by approximately $15,000,000.  Id. at 174.  On May 15, 2005,

---

[3] In 1996, CMS was known as the Health Care Financing Administration ("HCFA").  HCFA became CMS in 2001.  Statement of Organization, Functions and Delegations of Authority, Reorganization Order, 66 Fed. Reg. 35,437 (July 5, 2001).  For the sake of simplicity, this Order will uniformly refer to the organization as "CMS."

another of CMS's contractors recalculated the amount due, and concluded that Kaiser owed CMS a total of $9,083,831.00. _Id._ On September 8, 2005, and after further discussions between Kaiser, CMS, and CMS's contractors, Kaiser voluntarily submitted an amended cost report, reflecting a balance of $9,066,121.00 owed to CMS. _Id._ at 3. After additional discussions, Kaiser submitted a second amended cost report on October 26, 2005, increasing the amount owed to CMS to $10,334,176.00 (an increase of $1,268,055.00). _Id._ Kaiser then paid the total amount on June 30, 2006.

On July 14, 2006, CMS issued an NPR for the 1995 period -- at no time before this had an NPR been issued for this period. _Id._ at 4. The NPR indicated that Kaiser owed an additional $71,847.00 to CMS in overpaid contributions. _Id._ The NPR contained an additional demand, which is now the focus of this litigation: The NPR demanded interest on the overpaid contributions that had accrued from the dates that Kaiser had submitted its amended cost reports. _Id._ The NPR claimed that Kaiser owed CMS interest in the amount of $904,826.40. _Id._ This included 1) interest accrued between September 8, 2005, and June 30, 2006, on the $9,066,121.00 acknowledged in Kaiser's September 8, 2005, amended cost report; and 2) interest accrued between October 26, 2005, and June 30, 2006, on the $1,268,055.00 increase acknowledged in Kaiser's October 26, 2005, second amended cost report. _Id._ Kaiser paid the $71,847.00 in overpaid contributions on July 28, 2006, and paid the demanded interest on August 10, 2006. _Id._

### C.  **Procedural History**

Kaiser timely appealed the demand to pay interest under 42

C.F.R. § 405.1801.  _Id._  On January 7, 2008, the Hearing Officer

("HO") found for Kaiser.  _Id._ at 89-104.  In particular, the HO

found that 42 C.F.R. §§ 405.378(c)(1)(iv) and 405.378(e)(2)(i) only

permitted interest to accrue from the "due date of a timely filed

report."  _Id._ at 100-02.  The HO determined that, in the absence of

any record indicating that Kaiser's amended cost reports had a

specific due date, the voluntarily-filed amended cost reports could

not be considered "final determinations" and could not trigger the

accrual of interest.  _Id._ at 103-04.  The HO therefore concluded

that Kaiser could not be charged interest from the dates of its

amended cost reports.  _Id._ at 104.

Just three days after the HO issued his opinion, on January

10, 2008, the CMS Administrator notified Kaiser that it intended to

conduct its "own motion" review of the HO's decision.  _Id._ at 2,

84.  The Administrator reversed the conclusion of the HO.  _Id._ at

13-14.  The Administrator based this reversal on two alternate

holdings.  First, the Administrator concluded that, "in this case,

the final determination is the date [Kaiser] submitted its first

amended report that showed the overpayment due to CMS."  _Id._ at 11.

As an alternate holding, the Administrator found that Kaiser, as an

HCPP, had a "continuous duty" to "provide an amended cost report in

a timely fashion once errors are discovered."  _Id._ at 13.

Consequently, the Administrator found that "it would not be

unreasonable to conclude that the date an amended cost report is

filed is the date it is due under 42 C.F.R. 405.378(c)(1)(iv)."

_Id._  Under either holding, there would be a "final determination"

that triggered the accrual of interest starting from the date that

6

1  Kaiser submitted its amended cost reports, and the Administrator

2  reinstated the interest charge due to CMS.  _Id._  This constitutes

3  the final administrative decision of the Secretary, and Kaiser

4  timely sought judicial review before this Court pursuant to 42

5  U.S.C. § 1395oo(f)(1).  _See_ _id._ at 1; Compl. at 1.

6

7  **III.  <u>STANDARD OF REVIEW</u>**

8      Summary judgment under Rule 56(c) of the Federal Rules of

9  Civil Procedure may be granted where the pleadings and affidavits

10  show "that there is no genuine issue as to any material fact and

11  that the moving party is entitled to judgment as a matter of law."

12  Where a case involves review of a final agency determination under

13  the Administrative Procedures Act ("APA"), 5 U.S.C. § 706,

14  resolution generally "does not require fact finding on behalf of

15  [a] court."  <u>Northwest Motorcycle Ass'n v. United States Dep't of</u>

16  <u>Agric.</u>, 18 F.3d 1468, 1471-72 (9th Cir. 1994).  The parties here

17  have not contested any issues of fact, and it is therefore

18  appropriate to resolve this dispute by summary judgment.

19      Judicial review of the Secretary's final determination is

20  governed by the APA.  <u>See</u> 5 U.S.C. § 706; 42 U.S.C. § 1395oo(f)(1);

21  <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994).  A

22  reviewing court must "hold unlawful and set aside" the Secretary's

23  action if it is "arbitrary, capricious, an abuse of discretion, or

24  otherwise not in accordance with law."  5 U.S.C. § 706(2)(A);

25  <u>Thomas Jefferson Univ.</u>, 512 U.S. at 512.  Courts "must give

26  substantial deference to an agency's interpretation of its own

27  regulations," and this interpretation must be given "'controlling

28

7

weight unless it is plainly erroneous or inconsistent with the
regulation.'"   Thomas Jefferson Univ., 512 U.S. at 512 (quoting
Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)); see
also Martin v. Occupational Safety & Health Review Comm'n, 499 U.S.
144, 150-51 (1991) (deference owed to agency so long as meaning of
regulation is in doubt and only if "interpretation sensibly
conforms to the purpose and wording of the regulations . . ."
(quotation omitted)).

**IV.   DISCUSSION**

        Kaiser advances several arguments to support its position that
the Administrator was incorrect to allow CMS to charge interest
from the submission date of Kaiser's amended cost reports.  First,
Kaiser suggests that CMS has no authority to charge interest in the
HCPP cost reporting context.  Kaiser Mot. at 9-10.  Second, Kaiser
claims that the cost reports cannot be used to trigger the accrual
of interest under 42 C.F.R. § 405.378(b) and (c) because they were
not associated with any "due dates."  Id. at 10-16.  Third, Kaiser
faults CMS for not following the provisions printed in some of its
manuals.  Id. at 16-17.  Fourth, Kaiser asserts that the
Administrator's decision constitutes a new agency "policy," the
enforcement of which violates the APA and due process.  Id. at 17-
21.  The Court addresses each argument in turn.

        **A.   CMS's Authority to Charge HCPPs Interest**

        Kaiser first contends that "there is no statute that
authorizes interest in the HCPP cost reporting context."  Id. at 9.
CMS's regulations purport to allow CMS to collect interest on

overpayments to HCPPs.  See 42 C.F.R. § 405.378(a).  Kaiser argues that § 405.378 improperly includes HCPPs, as this regulation was designed to implement 42 U.S.C. §§ 1395g(d) and 1395l(j), neither of which explicitly mention HCPPs.  Kaiser Mot. at 9.  42 U.S.C.§ 1395g(d) authorizes charges of interest, but applies only to Medicare Part A.  42 U.S.C.§ 1395l(j), which does apply to Medicare Part B, applies only to "providers of services," and a HCPP is not generally included in the definition of "provider of services."  See 42 U.S.C. § 1395x(u)).[4]  This argument has implications that extend well beyond the narrow factual scope of this case.  If Kaiser's interpretation has merit, then CMS lacks the authority to charge interest from any HCPP, HMO, and CMP, even in circumstances that unambiguously fall within the scope of § 405.378, such as where CMS sends an HCPP an NPR with a written demand for payment.

The Court disagrees with Kaiser's limited interpretation of CMS's authority.  Regardless of whether Congress explicitly authorized CMS to charge interest from HCPPs, CMS has this authority.  Section 405.378(a) itself does not suggest that the authority to charge interest comes exclusively from the two statutory provisions that Kaiser cites.  It states that "[t]his section . . . implements sections 1815(d) and 1833(j) of the common law and Act, and authority granted under the Federal Claims Collection Act . . . ."  In addition, when the section was revised in 1991 to reflect the Secretary's then-existing practice of

_____

    [4] "The term 'provider of services' means a hospital, critical access hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice program . . . ."  42 U.S.C. § 1395x(u).

9

charging interest to HMOs, CMPs, and HCPPs, the Secretary clearly

articulated the legal basis for this practice:

> Common law allows the charging of interest on obligations not repaid timely.  Section 1876 of the [Social Security Act, codified at 42 U.S.C. § 1395mm], which sets forth the statutory provisions regarding HMOs and CMPs, does not specify how interest is to be charged on Medicare program payments to these plans.  However, section 1876(a)(5) of the Act states that payments to these plans are made from the Medicare part A and part B trust funds, and implicitly reflects an intention to integrate the debt collection policies which govern payments out of the trust funds. . . .  [W]e are making conforming changes to the regulations to reflect existing fiscal practices and to ensure uniformity of treatment for all Medicare expenditures as the law permits.

56 Fed. Reg. 31332, 31335 (July 10, 1991).  The Secretary's

position therefore draws support from the common law rule for

collecting interest on contractual obligations to the government.

Accord Royal Indem. Co. v. United States, 313 U.S. 289, 295 (1941)

("[T]he rule governing the interest to be recovered as damages for

delayed payment of a contractual obligation to the United States is

not controlled by state statute or local common law.").  It also

rests upon Congress's implicit grant of authority under the Social

Security Act, which permits CMS to issue and administer payments

from the two Medicare trust funds.  56 Fed. Reg. at 31335; 42

U.S.C. § 1395mm(a)(5).

Finally, Congress has given the Secretary broad rulemaking

authority to "prescribe such regulations as may be necessary to

carry out the administration of the insurance programs under"

Medicare, 42 U.S.C. § 1395hh(a), and "full power and authority to

make regulations and rules . . . which are necessary or

appropriate" to implement the program, 42 U.S.C. §§ 405(a), 1395ii. Kaiser's argument rests solely on the absence of language that explicitly refers to HCPPs in the sections that permit interest, and an absence of language explicitly permitting interest in the sections that refer to HCPPs.  This falls short of demonstrating an intention by Congress to abrogate the Secretary's broad discretion in this regard, or to limit interest payments exclusively to "providers of service."  Upon a final determination that an overpayment has been made to an HCPP (whatever form that "final determination" may take), the HCPP clearly owes an outstanding debt to the United States, upon which CMS can and has established a framework for charging interest.[5]  CMS has ample authority, founded upon statute and the common law, to charge interest on overpayments made to HCPPs as set out in 42 C.F.R. § 405.378.

      **B.**    **Whether 42 C.F.R. § 405.378 Permits Interest to Be Charged from the Date of Submission of Kaiser's Amended Cost Reports**

      Kaiser claims that CMS cannot charge interest from the date that the amended cost report was submitted because 42 C.F.R. § 405.378(b) only allows interest to accrue from the date of a

---

     [5] CMS also attempts to draw support from the Federal Claims Collection Act ("FCCA"), as amended by the Debt Collection Act, which permits agencies to charge "a minimum annual rate of interest on an outstanding debt on a United States claim owed by a person." 31 U.S.C. § 3717(a)(1); CMS Mot. at 22-23.  However, this section also specifically provides that interest under § 3717(a) begins to accrue upon the date that notice is mailed to the debtor or the debtor's last known address.  <u>See</u> 31 U.S.C. § 3717(b).  As CMS is seeking to impose interest from the time that Kaiser submitted its amended cost reports, and not from the time that CMS sent notice to Kaiser, CMS requires additional authority beyond that provided by the FCCA.  As discussed above, the Court finds adequate support from other sources for CMS's authority to charge interest.

1   "final determination," and § 405.378(c)(1)(iv) defines "final

2   determination" as "the due date of a timely-filed cost report,"

3   rather than the cost report itself.  <u>See</u> Kaiser Mot. at 11.  Kaiser

4   contends that amended cost reports have no due date, and therefore,

5   an amended cost report cannot generally be a "final determination."

6   <u>Id.</u>  As Kaiser puts it, "in order to trigger interest obligations

7   under this provision, an amended cost report must have a 'due

8   date.'"  <u>Id.</u>  However, the CMS Administrator concluded that the

9   provision "requires the accrual of interest beginning at the time

10  in which the [HCPP] acknowledges that an overpayment exists or the

11  due date for so determining, whichever is later," and that an

12  amended cost report's filing date could be construed as its "due

13  date" for the purposes of applying § 405.378(c)(iv).[6]  AR at 13.

14  This Court finds not only that the Administrator's decision is

15  reasonable and therefore entitled to deference, but also that the

16  conclusion reached by the Administrator was correct.

17      Kaiser is correct to state that the regulations do not

18  explicitly establish a due date for amended cost reports.  Instead,

19  the relevant regulations state only that "[a]mended cost reports .

20  . . may be permitted or required as determined by CMS."  42 C.F.R.

21  413.24(f).  As Kaiser notes, there is no technical barrier

22  preventing CMS from establishing a due date for particular

23

24  _____

25      [6] The Administrator put these propositions forward as
    alternate holdings.  AR at 13.  The Court finds it unnecessary to
26  consider these interpretations in the alternative.  Rather, the
    propositions that 1) the amended cost report itself may constitute
27  a "final determination" when there is no due date, and that 2) the
    date of submission of an amended cost report may be construed as
28  its "due date," are both reasonable and mutually reinforcing.

                                    12

revision, and there are sections of the Medicare Provider

Reimbursement Manual, Part I ("PRM-1"), that set due dates for

amended cost reports in particular contexts, or which allow

intermediaries to set due dates for amendments.  Kaiser Mot. at 11;

see also PRM-1, CMS Pub. 15-1 §§ 2176.2, 2931.2.A.  However, there

is no evidence that any due date was set in this case.  Kaiser's

position is that there is never a duty to submit an amended cost

report (unless explicitly ordered to do so by CMS or its

intermediaries).  See Kaiser Reply at 5-11.  This is not the

position of CMS.  Instead, CMS argues, and the Administrator held,

that there is a "continuous duty" to submit amendments to cost

reports that are later discovered to contain errors.  AR at 13; CMS

Reply at 3-6.  The Court finds that there is no need to resolve

this dispute here.  Regardless of whether the regulations compel

amended cost reports or merely permit them, the regulations do not

set a clear and specific due date for amended cost reports.

Because there was no explicit due date associated with

Kaiser's amended cost reports, Kaiser contends that

§ 405.378(c)(1)(iv) is inapplicable on its face.  Kaiser Mot. at

11-12.  According to Kaiser, there is simply no reasonable basis

for finding that there has been a "final determination" under the

regulations.  Id.  The Court disagrees, and finds instead that the

language of § 405.378 is ambiguous with respect to when interest

accrues after a voluntarily-filed amended cost report has been

filed.  The relevant portions of the regulation reads as follows:

///

///

13

           (b)   Basic rules.

                (1)   CMS will charge interest on overpayments, and pay interest on underpayments, to providers and suppliers of services . . . ;

                (2)   Interest accrues from the date of the final determination as defined in paragraph (c) of this section, and either is charged on the overpayment balance or paid on the underpayment balance for each full 30-day period that payment is delayed.

           (c)   Definition of final determination.

                (1)   For purposes of this section, any of the following constitutes a final determination:
. . .

                (iv) The due date of a timely-filed cost report that indicates an amount is due CMS, and is not accompanied by payment in full. . . .

42 C.F.R. § 405.378.

To begin, § 405.378(b)(1) states that "CMS will charge interest on overpayments . . . ." It does not require specific events to "trigger" the obligation to pay interest -- the overpayment is what "triggers" the obligation. The only question is when the interest begins to accrue. This is answered by § 405.378(b)(2), which states that "[i]nterest accrues from the date of the final determination as defined in paragraph (c) . . . ." Paragraph (c) then lists a number of events that "constitute[] a final determination," one of which is a cost report. 42 C.F.R. § 405.378(c)(1)(iv). The subsection that identifies cost reports as a "final determination" is unique from the other types of "final determinations" listed in the regulation, in that it contains the term "due date" (others do not make a specific mention of "dates" at all). Id.

Kaiser advances, and the HO accepted, the following reading of

the statute.  See Kaiser AR at 104; Mot. at 11-12.  Because
subparagraph (c)(iv) defines "final determination" as "[t]he due
date of a timely-filed cost report that indicates an amount is due
CMS . . . ," the "due date" could conceivably be construed as the
"final determination."  See 42 C.F.R. § 405.378(c)(1)(iv).  Hence,
Kaiser reasons, if there is no "due date," then there is no "final
determination."  However, although "due date" appears to be the
grammatical subject of § 405.378(c)(1)(iv), it would be
semantically awkward to read the "determination" referred to in
§ 405.378(b)(2) as a "date" rather than an event.  A
"determination" is best understood to be "a fixing of the position,
magnitude, or character of something," or possibly "the act of
deciding" or "the settling and ending of a controversy."  See
Webster's Third New International Dictionary 616 (3rd ed. 2002).  A
"determination" is not comfortably construed as a "date" --
particularly where the regulation referencing the "final
determination" already invokes the "date of the final
determination."  42 C.F.R. § 405.378(b)(2).  The Administrator
rejected Kaiser's reading, and this Court now rejects it as well.

     Instead, the term "cost report" should be read as the subject
of § 405.378(c)(1)(iv), and is therefore the "final determination,"
while the term "due date" is most reasonably read as a modification
of "date" in § 405.378(b)(2).  In other words, a cost report is a
"final determination," regardless of whether it has a due date, but
when read in conjunction with § 405.378(b)(2), interest should
accrue not from the "date" but from the "due date" of the cost
report.  Read together, sections 405.378(b)(2) and

15

§ 405.378(c)(1)(iv) should be construed as follows: "Interest accrues from the [due] date of the [cost report]."  This reading is also most consistent with § 405.378(e)(2)(i), which states that, "[i]f a cost report is filed and indicates that an amount is due CMS, interest on the amount due will accrue from the due date of the cost report . . . ."  In essence, this is how the Administrator read the statute, and this is the reading that the Court finds to be the most reasonable and the least awkward.  <u>See</u> AR at 12-13.

What if the cost report has no due date?  The regulation does not answer this question, one way or the other.  The plain language of this provision does not suggest that no interest accrues when participants provide cost reports that have no due dates -- indeed, such a reading would be inconsistent with § 405.378(b)(1), which provides that "CMS will charge interest on overpayments . . . ."  It simply leaves open the question of the date from which interest should be calculated.  On its face, the regulation is ambiguous.

Even though Kaiser has failed to persuade the Court that its interpretation of the regulation is "compelled by the regulation's plain language," Kaiser may attempt to show that its reading is compelled by "other indications of the Secretary's intent at the time of the regulation's promulgation."  <u>See</u> <u>Thomas Jefferson Univ.</u>, 512 U.S. at 512 (quoting <u>Gardebring v. Jenkins</u>, 485 U.S. 415, 430 (1988)).  However, the history of the regulation explains how this ambiguity came about, and objective indicia of the Secretary's intent provide more support for CMS's position than

16

they do for Kaiser's.  The regulation[7] initially read as follows:
"[A] final determination is deemed to occur . . . [u]pon the date
of submittal of a timely-filed cost report . . . ."  47 F.R. 54811,
54814 (Dec. 6, 1982) (to be codified at 42 C.F.R.
§ 405.376(c)(iii)).  This clearly refers to the date of submission,
and does not depend upon the presence or absence of a due date.[8]
In addition, in 1982, the Administrator for CMS (then HCFA) clearly
stated in the preamble of the regulation that, "[i]f a cost report
is filed and indicates an amount is due HCFA, interest will accrue
on that overpayment from the date the cost report is filed . . . ."
Id. at 54812.  The regulation did not, and still does not, draw any
distinction between initial and amended cost reports, and it
provided no reasonable basis for concluding or suspecting that
amended cost reports were to be excluded from triggering interest
accrual.  If the 1982 form of this regulation were still in effect
today, Kaiser would unambiguously be required to pay interest from
the date of submission of an amended cost report.

In 1984, the section was amended.  49 F.R. 36097 (Sept. 14,
1984).  Under a section of the Federal Register captioned

---

[7] The regulation was originally found at 42 C.F.R. § 405.376,
and was subsequently changed to 42 C.F.R. § 405.378 in 1996.  See
61 F.R. 63740, 63745 (Dec. 2, 1996).

[8] Kaiser argues that, even in the regulation's early form, the
phrase "timely-filed cost report" implies that the provision only
applies to cost reports that have a deadline.  Kaiser Reply at 25
n.30.  This is not the most reasonable reading of the provision.
By referring to "timely-filed" cost reports, the provision was
apparently not intended to exclude cost reports that have no due
dates, but to exclude any "untimely-filed" cost reports, which were
instead addressed by the subsequent provision.  See 42 C.F.R.
§ 405.376(c)(iv) (1982) (current version at 42 C.F.R.
§ 405.378(c)(v)).

17

"Technical Changes," the Administrator stated:

> We are revising the phrase "Upon the date of
> submittal of a timely-filed cost report . . ." to
> "Upon the due date of a timely filed cost report
> . . .". We are changing the language so that no
> providers will be discouraged from filing a cost
> report early when the report shows an amount due
> the program.

Id. at 36102.  Kaiser argues that this amendment indicates a clear

and unambiguous intent to exclude all cost reports that have no due

date, and that the use of the submission dates of such cost reports

to calculate interest would contradict the stated intent by giving

providers a disincentive to file early.  Kaiser Mot. at 14-15.

However, as CMS has argued, it was the 1984 amendment that

created the ambiguity that underlies this litigation -- it does not

clearly resolve the ambiguity in Kaiser's favor.  See CMS Reply at

10.  The preamble to the 1984 amendment still stated that, "[i]f a

cost report is filed and indicates an amount is due HCFA, interest

will accrue on that overpayment from the date the cost report is

filed . . . ."  49 F.R. at 36097.  The Administrator also responded

to an objection received by twenty-four commentators, to the effect

that "the filing of the cost report should not be considered as a

final determination nor as a 'triggering device' for the accrual of

interest when a cost report indicating an overpayment is submitted

and payment does not accompany the cost report."  Id. at 36098.

The Administrator's response was as follows:

> We do not agree with this comment. The filing of
> a cost report showing an overpayment is an
> admission by a provider that a debt exists that
> is therefore due and payable at that time.  This
> has always been our policy.  Before sections
> 1815(d) and 1833(j) of the Act were enacted,
> there was no incentive for compliance.  If a

18

> provider filed a cost report without returning
> any overpayment, we would need to monitor
> constantly, send a series of demand letters, and
> possibly suspend program payments.  The intent of
> Congress in adding these interest charges was to
> encourage more timely settlement.

Id.

By adding the word "due date" to the regulation, CMS apparently intended to delay, but not eliminate, the negative consequences of filing cost reports early in certain cases.  The fact that the 1984 amendment removed a disincentive for the early filing of cost reports, if they had a due date, is not enough to compel the conclusion that amended cost reports were exempt from the general policy considerations outlined by the Administrator. See id.  These considerations strongly suggest that the Administrator intended that the accrual of interest be triggered by all cost reports (i.e., to reduce the need to "monitor constantly, send a series of demand letters, and possibly suspend program payments"), notwithstanding the single counterproductive consequence identified by Kaiser (i.e., interest accrual would provide an incentive to delay filing of amended cost reports).  Id. Indeed, the Administrator's stated policy that a cost report "is an admission . . . that a debt exists that is therefore due and payable at that time" has been repeated in the course of later amendments.  Id.; see also 56 F.R 31332, 31334 (July 10, 1991) ("[A] cost report showing an overpayment is a statement by the provider that it has been overpaid.  Based on that statement, payment should accompany the report.").  The Administrator's language with respect to "cost reports" has always been general,

1   and the Administrator has not indicated any intent to exclude the

2   use of amended cost reports as "final determinations."

3        The Court finds that the regulation, as illuminated by remarks

4   made by CMS and its predecessor at various points in the

5   regulation's history, amply supports the position taken by the

6   Administrator in the current case.  A cost report acknowledges a

7   debt owed to CMS, and is a "final determination" under the

8   regulation.  The due date of a cost report, if there is one,

9   normally modifies the date at which interest begins accruing under

10  42 C.F.R. §§ 405.378(b)(2) and 405.378(c)(1)(iv).  If there is no

11  certain due date for the cost report, as with amended cost reports,

12  then interest begins to accrue from the date of submission, and it

13  would not be unreasonable to conclude that the submission date of a

14  cost report is the "due date" for the purposes of calculating the

15  accrual of interest.  The language of the regulation permits this

16  interpretation, and the regulatory history strongly supports it.

17       **C.   CMS's Failure to Follow Its Manual Provisions**

18       Kaiser claims that CMS failed to follow several of its manual

19  provisions related to recovering overpayments, and that CMS

20  therefore should not be permitted to charge interest in this case.

21  Kaiser Mot. at 16.  This argument is based upon the fact that CMS's

22  intermediary failed to send Kaiser a demand letter for the amounts

23  reflected in Kaiser's amended cost reports.[9]  Kaiser contends that

24  CMS's intermediary must send a demand letter if a filed cost report

25

26  _____

27       [9] Kaiser has alleged, or has at least implied, that neither
    CMS nor its intermediaries sent a demand latter.  <u>See</u> Kaiser Mot.
    at 16.  CMS has not disputed this claim.

28                                  20

shows an overpayment.  Id.; PRM-1 § 2409.1.A.2.  Kaiser also cites
several provisions of the Medicare Financial Management Manual
("MFMM"), which sets out content specifications for demand letters,
MFMM Ch. 4 § 20.2, and states that "[i]n general the [intermediary
of CMS] shall send three overpayment demand letters to a provider,"
id. § 20.1, and also instructs intermediaries to send "reminder
letters" in some circumstances, id. § 30.5.A.2.  Kaiser Mot. at 16.
Finally, Kaiser cites the Medicare Managed Care Manual ("MMCM"),
which states that "if repayment is made by the HCPP within 30 days
of notification by CMS of the overpayment, no interest will be
charged," MMCM, Sub. A, § 30, and also that, absent an NPR, a
"final determination" occurs upon "issuance of either: 1) A written
demand for payment; or 2) A written determination of an
underpayment by CMS after the cost report is filed."  Id. § 30.1.2.
Based on these manual provisions, Kaiser claims that interest
cannot begin to accrue until after CMS or its intermediary sends a
demand letter.  Kaiser Mot. at 16-17.

    The thrust of Kaiser's argument appears to be that Kaiser has
a substantive right to receive a demand letter, which it is now
asserting against CMS in an apparent attempt to estop CMS from
enforcing its regulations against Kaiser.  However, agency manuals
do not universally create rights that carry the force of law, such
that they could inhibit the enforcement of regulations.  See United
States v. Alameda Gateway, Ltd., 213 F.3d 1161, 1168 (9th Cir.
2000) (plaintiff cannot rely on publication that "was not intended
to have the force of law"); Moore v. Apfel, 216 F.3d 864, 869 n.2
(9th Cir. 2000) ("Interpretations of statutes or Federal

Regulations contained in agency manuals lack the force of law and are not entitled to Chevron deference by a reviewing court."). To have the binding effect of law, the manuals must:

> (1) Prescribe substantive rules - not interpretive rules, general statements of policy or rules of agency organization, procedure or practice - and, (2) conform to certain procedural requirements. To satisfy the first requirement the rule must be legislative in nature, affecting individual rights and obligations; to satisfy the second, it must have been promulgated pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress.

United States v. Fifty-Three Eclectus Parrots, 685 F.2d 1131, 1136 (9th Cir. 1982); see also Moore, 216 F.3d at 686 (quoting Fifty-Three Eclectus Parrots).  When a litigant seeks to enforce a manual provision against an agency, the reviewing court must begin by analyzing the text of the manual to determine whether the rule or provision is "substantive."  See Moore, 216 F.3d at 686.

Of the manual provisions cited by Kaiser, the provision in the PRM-1 provides the clearest indication that CMS's intermediaries will send a demand letter.  PRM-1 § 2409.1.A.2 simply states that "if the provider does not remit full refund with the cost report, . . . the intermediary will immediately send the first demand letter requesting a lump-sum refund."  The PRM-1 addresses itself to providers, and is therefore not purely "internal" guidance.[10] However, it only purports to interpret substantive rules, rather than create or amend regulations.  It explicitly states that

---

[10] The PRM-1 was "devised to accommodate program needs and the administrative needs of providers" and "to assist provider in preparing annual cost reports."  PRM-1 at I.

although "[t]he provisions of the law and the regulations are
accurately reflected in this manual, [] it does not have the effect
of regulations." <u>Id.</u> at I.   The purpose of the manual is clearly
to provide guidance, and consequently, it "was not intended to
create substantive rights in third parties . . . or to paralyze
[CMS] by conditioning the exercise of [its] authority on the
satisfaction of several requirements by" CMS's intermediary.   <u>See</u>
<u>Alameda Gateway, Ltd.</u>, 213 F.3d at 1168.   The manual does not
suggest that any right or interest of Kaiser (let alone the accrual
of interest) is contingent upon a demand letter.   Moreover, the
requirement that CMS's intermediary send a demand letter "was not
published in either the Code of Federal Regulations or the Federal
Register, providing further evidence that the regulation was not
intended to be binding."   <u>Id.</u>

Even assuming that the PRM-1 provided Kaiser with some kind of
substantive right, it is not clear that the relief that Kaiser is
requesting would be appropriate.   The PRM-1 does not suggest that
the accrual of interest, or anything else, is conditioned upon the
demand letters.   It does not suggest that a demand letter is
necessary for a "final determination" to occur for the purposes of
42 C.F.R. § 405.378(b)(2).   Moreover, reading it this way would
contravene the language of the regulation, since the regulation
states that "interest accrues from the date of a final
determination," and not from the date of a notice sent subsequent
to a final determination.   <u>See</u> 42 C.F.R. § 405.378(b)(2).   The fact
that a demand letter may be considered one form of a "final
determination," 42 C.F.R. § 405.378(c)(1)(i)-(ii), but is not

required for other forms of "final determination," strongly
suggests that the manual provisions were not intended to affect the
date at which interest would accrue.  Rather, the manual provisions
describe an action that an intermediary could or should take,
without addressing or suggesting the consequences of a failure to
do so.

     The other manuals cited by Kaiser (the MFMM and MMCM)
similarly fail to advance Kaiser's position.  The MFMM simply
describes the content of demand letters, and states that
intermediaries must send and keep three demand letters to the
provider.  See MFMM Ch. 4 §§ 20.1-20.2.  It does not state that
these letters will mark the accrual of interest.  The MMCM does
address the question of when interest will accrue, but at best,
this manual simply restates the ambiguity of 42 C.F.R. § 405.378.
See MMCM, Sub. A, § 30 ("in order to avoid the imposition of
interest if the overpayment arises out of the filing of a cost
report . . . [f]ull payment must be made by the due date of the
cost report . . . .").  Kaiser notes that one section of the MMCM
offers a definition of "final determination" that is limited to the
first two types of "final determinations" listed by 42 C.F.R.
§ 405.378(c).  Id. § 30.1.2; Kaiser Reply at 21.  Not only does
this provision exclude any mention of cost reports, but it also
fails to list ALJ decisions, carrier reasonable charge
determinations, interim cost settlements, and initial retroactive
adjustment determinations, all of which are referenced by the
regulation defining "final determinations."  See 42 C.F.R.
§ 405.378(c)(1)(ii) -(v).  As such, this provision cannot be

intended as an exhaustive and limiting account of "final determinations."  As the MMCM provision acknowledges, 42 C.F.R. § 405.378 "sets forth the rules for charging and payment of interest."  Id. § 30.1.  The fact that the MMCM recites some portions of the regulation, but not others, should not be taken to mean that the unrecited portions are not in force.  Kaiser cannot rely upon these manual provisions to bar the accrual of interest or to establish a precondition for accrual.

The cases cited by Kaiser are not to the contrary.  See Kaiser Reply at 22-23.  Two of the cases that Kaiser cites suggest that agency actions granting specific rights or benefits to a regulated entity, in accordance with provisions promulgated outside of regulations, cannot be arbitrarily reversed.  In Massachusetts Fair Share v. Law Enforcement Assistance Admin., two agencies had cooperated to create and jointly operate the Urban Crime Prevention Program, and awarded a grant to the finalist of a long, joint selection process, as set out in non-regulatory program guidelines. 758 F.2d 708, 709-10 (D.C. Cir. 1985).  After one of the agencies attempted to unilaterally reverse the joint decision to award the finalist the grant, in contravention of the program guidelines, the finalist brought suit and succeeded because neither agency had the power to universally revoke the award.  Id. at 712; see also Reuters, Ltd. v. F.C.C., 781 F.2d 946, 950 (D.C. Cir. 1986) (addressing FCC's decision to rescind grant of radio license).  In contrast, nothing specific or substantive has been granted to Kaiser by the cited manual provisions.  Although the manual provisions suggest that an intermediary will issue a demand letter

when a cost report recognizes an overpayment, they make no

assurances that insurance will not accrue in the absence of any

such letter.  See PRM-1 § 2409.1.A.2.  In addition, Kaiser cites

two cases that stand for the proposition that manual provisions may

be afforded substantial deference by a reviewing court,

particularly where they shed light on an ambiguous regulations.

See Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 97-100 (1995);

Daviess County Hosp. v. Bowen, 811 F.2d 338, 345 (7th Cir. 1987).

However, the manual provisions that Kaiser cites do not purport to

clarify the ambiguities of the underlying regulation.

Although CMS and its intermediaries evidently failed to follow

through on the provisions set out in PRM-1 § 2409.1.A.2, the manual

provisions do not set down any basis for concluding that Kaiser had

a substantive right to receive a demand letter.  Even if Kaiser's

"right" had been breached, there would be no basis for concluding

that the remedy would prevent CMS from applying its interest

regulations against Kaiser.

**D.   Kaiser's Due Process Claims**

Kaiser contends that, with the ruling below, the Secretary has

sought to promulgate a substantive rule in violation of the APA's

notice and comment requirements, and that the policy is void as

applied to Kaiser because it is unpublished and because Kaiser

lacked notice.  Kaiser Mot. at 17-22.

First, Kaiser contends that the Administrator's ruling was a

"disingenuous interpretation of the rule to mean something other

than its original meaning . . . ."  Kaiser Mot. at 17-19; Hemp

Indus. Ass'n v. Drug Enforcement Admin., 333 F.3d 1082, 1087 (9th

Cir. 2003).  The Ninth Circuit recognizes a difference between "substantive laws" on the one hand, which "create rights, impose obligations, or effect a change in existing law," and "interpretive rules" on the other, which "merely explain, but do not add to, the substantive law that already exists . . . ."  Hemp Indus., 333 F.3d at 1087.  The following three circumstances are the hallmarks of a "substantive law" that requires notice and comment rulemaking:

> (1) when, in the absence of the rule, there would not be an adequate legislative basis for enforcement action;
> (2) when the agency has explicitly invoked its general legislative authority; or
> (3) when the rule effectively amends a prior legislative rule.

Id. (citing Am. Mining Congress v. Mine Safety & Health Admin., 995 F.2d 1106, 1109 (D.C. Cir. 1993)).

Kaiser has characterized the Administrator's decision as a change in policy.  Kaiser Mot. at 17.  However, the Administrator's decision was not a change in policy that would require formal notice and rulemaking as a new "substantive law."  This was not a situation in which an agency attempted to reverse positions on a clear and unambiguous regulation.  C.f. Hemp Indus., 333 F.3d at 1091.  Instead, Kaiser has failed to establish that, before this ruling, CMS ever took the position that such cost reports would not trigger the accrual of interest.  As discussed in Part IV.A., supra, the regulation's language is ambiguous with respect to when interest begins to accrue after the filing of cost reports that have no "due date."  CMS had previously and repeatedly issued statements that suggest that cost reports acknowledge debts owed to the government, and should be accompanied by payment in order to

avoid the accrual of interest. <u>See</u>, <u>e.g.</u>, 49 F.R. at 36098; MMCM, Sub. A, § 30. These statements strongly suggested that, in spite of the textual ambiguity in the regulation, the Administrator's position has been and continues now to be the policy of CMS.

For the same reasons, Kaiser cannot prevail by arguing that the policy is void as unpublished, or that Kaiser lacked notice of the policy. Kaiser has been charged interest on an overpayment, which it chose not to repay for months after it acknowledged the debt. The regulation unambiguously states that "CMS will charge interest on overpayments," 42 C.F.R. § 405.378(b)(1), so Kaiser cannot argue that it reasonably expected that it could forestall repayment indefinitely. The Court has already addressed the regulatory history, which included publications that suggested that providers would face a significant risk of accruing interest upon filing any cost report. <u>See</u> Part IV.A., <u>supra</u>. Kaiser has itself cited from manuals that explicitly warn that, "in order to avoid the imposition of interest if the overpayment arises out of the filing of a cost report . . . [f]ull payment must be made by the due date of the cost report . . . ." MMCM, Sub. A, § 30. Finally, as a sophisticated party that repeatedly deals with CMS, Kaiser should have anticipated that, as soon as it acknowledged a past debt, there was at least a strong possibility that interest could begin to accrue. Kaiser has failed to establish that the Administrator's decision was a retroactive change, or that it had insufficient notice such that the Administrator's ruling was unfair.

This case is distinguishable from <u>Radio Athens, Inc. v.</u>

28

1  <u>F.C.C.</u>, 401 F.2d 398 (D.C. Cir. 1968), which Kaiser cited for the

2  proposition that a Court may reverse the unfair application of an

3  unclear regulation.  Kaiser Mot. at 21.  That case involved a

4  series of overlapping procedural rules, coupled with an F.C.C.

5  determination that was a departure from its prior practices of

6  dealing with duopolies by holding hearings and issuing conditional

7  grants.  <u>Radio Athens</u>, 401 F.2d at 400-403.  These overlapping

8  rules and determinations combined to deprive an applicant of a

9  chance to receive a construction permit without a hearing.  <u>Id.</u>  In

10  contrast, Kaiser has not been deprived of a hearing without notice.

11  Rather, Kaiser chose to delay repayment after it had acknowledged

12  an overpayment by CMS, and it had ample notice that CMS was likely

13  to seek interest.  The application of the interest regulation to

14  Kaiser's overpayment is therefore not unfair.

15

16  **V.    <u>CONCLUSION</u>**

17      For the reasons stated above, the Court GRANTS CMS's motion

18  for summary judgment and DENIES Kaiser's motion for summary

19  judgment.

20

21      IT IS SO ORDERED.

22

23      July 9, 2009

24                                    _____
                                      UNITED STATES DISTRICT JUDGE
25

26

27

28                               29